IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ALBERT RISDORFER,

*Plaintiff*,

v.                                                          Civil Action No. ELH-23-987

ASCENTAGE PHARMA GROUP INC.,

*Defendant*.

## MEMORANDUM OPINION

Plaintiff Albert Risdorfer filed suit in State court against his former employer, Ascentage Pharma Group, Inc. ("Ascentage"). *See* ECF 5 (the "Complaint").[1] In Count I, titled "Retaliation," plaintiff alleges a claim of unlawful retaliation, pursuant to "Section 27-19 of the Montgomery County, Maryland Human Rights Ordinance ('MCHRO')"; Md. Code (2021 Repl. Vol., 2022 Supp.), § 20-1202 of the State Government Article ("S.G."); and Maryland common law. *Id.* at 1. Count II is titled "Wrongful Termination in Violation of Public Policy." *Id.* at 9.

According to plaintiff, he engaged in protected activity when he disclosed to defendant that its hiring practices were discriminatory, and defendant retaliated by terminating his employment on January 14, 2022. Further, plaintiff maintains that his termination "violated a clear mandate of public policy because Risdorfer was terminated for reporting . . . his concerns regarding Ascentage's failure to comply with ERISA . . . ." ECF 5, ¶ 49(v). Plaintiff seeks, *inter alia*, compensatory and punitive damages, attorney's fees, and costs. ECF 5.

---

[1] The Complaint does not contain a comma in the defendant's name. However, defendant uses a comma in its submissions. *See*, *e.g.*, ECF 1.

Suit was initially filed in the Circuit Court for Montgomery County, Maryland.  ECF 1-2. Ascentage, a Delaware corporation "headquartered" in Maryland, ECF 5, ¶ 2, timely removed the case to federal court, based on federal question jurisdiction under 28 U.S.C. § 1331.  ECF 1 ("Notice of Removal").   In particular, defendant contends that plaintiff's claims are based on alleged violations of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §1001 *et seq.*; *see also* ECF 7.

Ascentage has moved to dismiss the suit, pursuant to Fed. R. Civ. P. 12(b)(6).  ECF 7.  The motion is supported by a memorandum. ECF 7-1 (collectively, the "Motion to Dismiss"). Plaintiff opposes the Motion to Dismiss. ECF 10. Ascentage replied. ECF 14.

Risdorfer filed a motion to remand (ECF 13), supported by a memorandum. ECF 13-1 (collectively, the "Motion to Remand"). Ascentage opposes the Motion to Remand. ECF 15. Risdorfer replied. ECF 16.

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion to Remand and deny the Motion to Dismiss, without prejudice to defendant's right to renew the motion in State court.

## I.      Factual and Procedural Background[2]

Ascentage is a Delaware corporation with its headquarters in Rockville, Maryland.  ECF 5, ¶ 2. It is the U.S. subsidiary of Ascentage Pharma Group International ("Ascentage International"), a Chinese multinational corporation. *Id.* ¶ 10.

---

[2] At this juncture I must assume the truth of the facts alleged in the suit. *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019).

Throughout the Memorandum Opinion, the Court cites to the electronic pagination. However, the electronic pagination does not always correspond to the page number imprinted on a particular submission.

On or about December 1, 2021, Ascentage hired Risdorfer to serve as the company's senior director of human resources ("HR"). ECF 5, ¶ 9. As part of plaintiff's employment offer, Risdorfer was awarded a signing bonus.  But, the bonus was subject to repayment if plaintiff's employment were to end within a year, unless he was laid off or his position was eliminated. *Id.* ¶ 9.

Jim Tripp, Ascentage's vice president of U.S. operations, told Risdorfer that he was hired to "drive much needed changes" in the company's HR department. *Id.* ¶ 11. Tripp intended to replace Jason Gilmore, who was then Ascentage's director of HR. *Id.* ¶ 13. Risdorfer's "second-line supervisor" was Dajun Yang, CEO of Ascentage. *Id.* ¶ 12.[3] Yang lived in China, but also visited Ascentage's office in Maryland on a frequent basis. *Id.*  In addition, Yang served as Tripp's direct supervisor. *Id.*

Upon commencing employment, Risdorfer learned that Gilmore was still employed by Ascentage. *Id.* ¶ 14. And, Risdorfer learned from Tripp that he (Risdorfer) would have to terminate Gilmore, one of the few African American men at Ascentage. *Id.* ¶¶ 14, 23. Risdorfer told Tripp that he needed to learn about the company's human resource processes, which were not well documented. *Id.* ¶ 15. Risdorfer also told Tripp that he would wait to terminate Gilmore until he familiarized himself with Ascentage's HR processes. *Id.*

Soon after plaintiff's employment began, he "determined that Ascentage's human resources functions were dysfunctional and error prone." *Id.* ¶  16. And, Gilmore informed Risdorfer that "some of Ascentage's practices may have been also unlawful." *Id.*

For example, Gilmore informed Risdorfer that Ascentage "ordered" Gilmore to provide the Chinese parent company with employees' personal health information, in violation of the

---

[3] The Complaint does not indicate whether Yang was the CEO of Ascentage or Ascentage International.

Health Insurance Portability and Accountability Act, and also with employees' social security numbers. ECF 5, ¶¶ 17, 18. Gilmore's refusal to send the information was met with "animosity" from Ascentage's parent company. *Id.* ¶ 18. Gilmore also learned that Ascentage was "improperly handling" the tax "obligations" of U.S. citizens working in China. *Id.* ¶ 19. He attempted to investigate these issues, but Tripp prevented him from doing so, and told Gilmore that it was "'none of his business.'" *Id.* ¶ 20.

Moreover, Risdorfer "independently" discovered that "several of Ascentage's tax and employment practices were possibly unlawful." *Id.* ¶ 21. Risdorfer reported his concerns to Tripp in December 2021, and indicated that Tripp "needed to investigate" the issues. *Id.* ¶ 22. But, Tripp "told Risdorder 'not to worry about it'" and thus Risdorfer was unable to investigate further. *Id.*

Also in December 2021, Risdorfer determined that terminating Gilmore would place Ascentage "at risk of a lawsuit," as Gilmore's "internal reports of possible" illegal activity were protected activity under federal and state law. *Id.* ¶ 23. Further, plaintiff "realized" that because Gilmore was "one of the few African American men at Ascentage," firing him could lead to a race discrimination claim. *Id.* At about the same time, Risdorfer told Tripp that Ascentage was "hiring a disproportionate number of Chinese managers," placing the company at risk of claims of racial bias and employment discrimination. *Id.* ¶ 28. But, "Tripp dismissed Risdorfer's concerns and warnings." *Id.*

During the same time frame, Risdorfer proposed filling an HR manager vacancy with an experienced HR professional, known to Risdorfer, who was not Chinese. *Id.* ¶ 29. But, Yang and Ascentage's head of finance, Lei Elaine Zhi, opted to hire a less qualified employee with no HR experience "who was Chinese and apparently connected to one of Yang's friends." *Id.*

A few days before December 25, 2021, Risdorfer met with Yang to provide an update as

to his "progress" in reforming Ascentage's HR "functions." ECF 5, ¶ 24. Yang was mainly concerned about Risdorfer's "progress in firing Gilmore," and Risdorfer shared his reservations in connection with the proposed termination. *Id.* ¶ 25.

In mid January of 2022, Risdorfer suggested to Tripp that, in lieu of termination, Gilmore should instead be demoted in exchange for a waiver of potential claims. *Id.* ¶ 26. Alternatively, Risdorfer proposed that Gilmore be terminated "while offering a generous severance package to incentivize Gilmore to release potential claims against Ascentage." *Id.* ¶ 26. Tripp told Risdorfer "that both options 'were dead on arrival'" and that "Yang wanted Gilmore terminated without a severance package," regardless of legal liability. *Id.* ¶ 27. Further, Tripp suggested that Ascentage's counsel, Thomas Knapp, "had nothing to do" and a potential lawsuit would give Knapp "an opportunity to 'finally earn his pay.'" *Id.*

Also in January 2022, Risdorfer shared concerns with Tripp regarding Ascentage's practice of bringing in workers with green cards and H1B visas, potentially in violation of United States immigration laws, and straining Ascentage's budget. *Id.* ¶¶ 30, 31. "Tripp did not answer." *Id.* ¶ 31. Because Ascentage was bringing in so many workers from China, Tripp decided to "cap" the amount of the contribution of the U.S. operation for such applications to under $10,000. *Id.* ¶ 30.

Risdorfer observed that many of the positions could be filled by American workers. *Id.* ¶ 31. And, plaintiff "repeated his complaint" as to Ascentage's "improper use of HIB visas and green card applications . . . ." *Id.* ¶ 32. Tripp told Risdorder to "'mind his [own] business'" and that the "women Ascentage was bringing in were 'well-connected' because they were Yang's friends' children." *Id.* (alteration in original)

Further, Risdorfer "observed and reported Ascentage's non-compliance with several tax and employment regulations." *Id.* ¶ 33. These included that Ascentage was "not depositing

employee income deductions" for the company's health savings account ("HSA"), flexible spending account ("FSA"), "as well as contributions to the 401K into those accounts". ECF 5, ¶ 33.  "Risdorfer reported to Tripp that Ascentage had a fiduciary responsibility under [ERISA] to make sure that Ascentage properly deposited deductions into in [sic] employee accounts." *Id.* ¶ 34. Tripp told Risdorfer "'don't worry about it.'" *Id.* Risdorfer also discovered that Ascentage was not following federal regulations that govern pharmaceutical companies, as defined in 21 C.F.R. Part 211. *Id.* ¶ 35.

On January 14, 2022, Tripp told Risdorfer that, "under Yang's direction," Ascentage was terminating Risdorfer's employment because he "'was not a good fit.'" *Id.* ¶ 36. Initially, Tripp informed Risdorfer that Ascentage would seek repayment of the signing bonus. *Id.* But, Tripp indicated that if Risdorfer "resigned in lieu of being terminated," Risdorfer could keep the signing bonus and also receive "a full paycheck." *Id.* ¶ 37. In reliance on Tripp's "promise," Risdorfer submitted his resignation. *Id.* Nevertheless, Ascentage sought repayment of the signing bonus and only provided "twelve hours of additional pay." *Id.* ¶ 38.

Risdorfer alleges that he would not have resigned "[i]f not for Ascentage's fraudulent inducement or its promise to pay . . . ." *Id.* ¶ 39. But, "Ascentage eventually ceased demanding repayment of the sign on bonus." *Id.* ¶ 39.

Plaintiff asserts that his "protected activity was a motivating factor in Ascentage's decision to terminate" his employment. *Id.* ¶ 53. And, Risdorfer alleges that Ascentage retaliated against him when it sought his termination. *Id.* ¶ 44.  Indeed, Risdorfer notes that there were no "legitimate business reasons" for Ascentage's actions and that "its stated reasons are pretext." *Id.* ¶ 45.

Risdorfer pursued an administrative remedy by filing a charge of retaliation with the Montgomery County Office of Human Rights on November 8, 2022. *Id.* ¶ 7. This suit followed

forty-five days after the filing of the administrative charge. ECF 5, ¶ 8.

As noted, the suit contains two counts.  Count I asserts retaliation under S.G. § 20-1202 *et seq.*  Plaintiff asserts that he engaged in protected activity under MCHRO § 27-19 by disclosing that Ascentage's hiring practices were discriminatory based on national origin and race.  *Id.* ¶ 43.[4] And, he claims that he was terminated in retaliation for his conduct.  *Id.* ¶ 44. Notably, Count I does not allege that the retaliation was related to ERISA any way whatsoever.

In Count II, the wrongful discharge claim, plaintiff asserts that his discharge "violated a clear mandate of public policy" because he was terminated for "reporting" multiple "concerns." *Id.* ¶ 49.  These included, *inter alia*, "his concerns regarding Ascentage's failure to comply with ERISA."  *Id.* ¶ 49(v).

Plaintiff seeks, *inter alia*, back pay; reinstatement or front pay; equitable relief; compensatory, non-economic damages; damages for emotional distress; and punitive damages. *Id.* at 10; *id.* ¶ 40.

## II.      Legal Standards and Doctrines

### A.  Removal

Under 28 U.S.C. § 1441, the general removal statute, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction" may be "removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."  *Id.* § 1441(a).  But, "removal jurisdiction raises significant federalism concerns."  *Mulcahey v. Columbia Organic Chemicals Co.*, 29 F.3d 148, 151 (4th Cir. 1994) (citing *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100

---

[4] Although Count I refers to discrimination based on race and national origin, the factual recitation refers only to racial discrimination.  *See* ECF 5, ¶ 28.

(1941)).  Therefore, courts "must strictly construe" removal statutes and resolve all doubts in favor of remanding a case to state court.  *Mulcahey*, 29 F.3d at 151.

The federal courts are "courts of limited jurisdiction" and "possess only that power authorized by Constitution and statute."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)); *see Home Buyers Warranty Corp. v. Hanna*, 750 F.3d 427, 432 (4th Cir. 2014).  They "may not exercise jurisdiction absent a statutory basis."  *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005).  Therefore, a federal court must presume that a case lies outside its limited jurisdiction unless and until jurisdiction has been shown to be proper.  *United States v. Poole*, 531 F.3d 263, 274 (4th Cir. 2008) (citing *Kokkonen*, 511 U.S. at 377).  And, Congress may not confer jurisdiction absent a constitutional basis.  *Shamrock Oil*, 313 U.S. at 108–09 ("The power reserved to the states under the Constitution to provide for the determination of controversies in their courts, may be restricted only by the action of Congress in conformity to the Judiciary Articles of the Constitution.").

Congress has conferred jurisdiction on the federal courts in several ways.  Of relevance here, Congress has conferred on the district courts original jurisdiction over civil actions that arise under the Constitution, laws, or treaties of the United States, in order to provide a federal forum for plaintiffs who seek to vindicate federal rights.  *See* U.S. Const. art. III, § 2 ("The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made . . ."); *see also* 28 U.S.C. § 1331; *Exxon Mobil Corp.*, 545 U.S. at 552.  This is sometimes called federal question jurisdiction.[5]

---

[5] In addition, "Congress . . . has granted district courts original jurisdiction in civil actions between citizens of different States, between U.S. citizens and foreign citizens, or by foreign states against U.S. citizens," so long as the amount in controversy exceeds $75,000.  *Exxon Mobil Corp.*, 545 U.S. at 552; *see* 28 U.S.C. § 1332.  This is known as diversity jurisdiction.  It "requires complete diversity among parties, meaning that the citizenship of *every* plaintiff must be

The burden of demonstrating jurisdiction and the propriety of removal rests with the removing party. *See McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010) (Agee, J., concurring in part and dissenting in part); *Robb Evans & Assocs., LLC v. Holibaugh*, 609 F.3d 359, 362 (4th Cir. 2010); *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 816 (4th Cir. 2004) (en banc); *Mulcahey*, 29 F.3d at 151. Therefore, "[i]f a plaintiff files suit in state court and the defendant seeks to adjudicate the matter in federal court through removal, it is the defendant who carries the burden of alleging in his notice of removal and, if challenged, demonstrating the court's jurisdiction over the matter." *Strawn v. AT & T Mobility LLC*, 530 F.3d 293, 296 (4th Cir. 2008). In this way, a failure of proof that jurisdiction exists cuts against the removing party. And, if "a case was not properly removed, because it was not within the original jurisdiction" of the federal court, then "the district court must remand [the case] to the state court from which it was removed." *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 8 (1983) (citing 28 U.S.C. § 1447(c)).

In sum, courts are required to construe removal statutes narrowly. *See Shamrock Oil*, 313 U.S. at 109; *Mulcahey*, 29 F.3d at 151. This is because "the removal of cases from state to federal court raises significant federalism concerns." *Barbour v. Int'l Union*, 640 F.3d 599, 605 (4th Cir. 2011) (en banc) ("*Barbour II*"), *abrogated in part on other grounds by* the Federal Courts

---

different from the citizenship of *every* defendant." *Cent. W. Va. Energy Co., Inc. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011) (emphasis added); *see Strawbridge v. Curtiss*, 7 U.S. 267, 267 (1806). Although defendants do not argue otherwise, the Court observes that removal of this case was not based on diversity jurisdiction.

Under 28 U.S.C. § 1367(a), district courts are also granted "supplemental jurisdiction over all other claims that are so related to claims in the action within [the courts'] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

Jurisdiction and Venue Clarification Act of 2011, Pub. L. No. 112-63, 125 Stat. 758 (2011); *see also Mulcahey*, 29 F.3d at 151 (citing *Shamrock Oil*, 313 U.S. 100) ("Because removal jurisdiction raises significant federalism concerns, [courts] must strictly construe removal jurisdiction."). Thus, "any doubts" about removal must be "resolved in favor of state court jurisdiction." *Barbour II*, 640 F.3d at 617; *see also Cohn v. Charles*, 857 F. Supp. 2d 544, 547 (D. Md. 2012) ("Doubts about the propriety of removal are to be resolved in favor of remanding the case to state court.").

## B.  Federal Question Jurisdiction

Pursuant to U.S. Const. art. I, § 8, cl. 9, Congress has the power to prescribe the jurisdiction of federal courts.  But, it "may not expand the jurisdiction of the federal courts beyond the bounds established by the Constitution." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 491 (1983).  Article III, § 2, cl. 1 of the Constitution provides: "The judicial Power shall extend to all Cases, in Law and Equity, arising under . . . the Laws of the United States[.]"  And, 28 U.S.C. § 1331 grants federal district courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  The "propriety" of removal based on federal question jurisdiction "depends on whether the claims 'aris[e] under' federal law." *Pinney v. Nokia, Inc.*, 402 F.3d 430, 441 (4th Cir. 2005) (alteration in original) (citation omitted).

A case "can 'aris[e] under' federal law in two ways." *Gunn v. Minton*, 568 U.S. 251, 257 (2013) (alteration in original); *see Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003).  First, and most commonly, "a case arises under federal law when federal law creates the cause of action asserted." *Gunn*, 568 U.S. at 257; *see also Am. Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916) (stating that a "suit arises under the law that creates the cause of action").  Second, a claim is deemed to arise under federal law for purposes of § 1331 when, although it finds its origins in state law, "the plaintiff's right to relief necessarily depends on resolution of a substantial

-10-

question of federal law." *Empire Healthchoice Assurance Inc. v. McVeigh*, 547 U.S. 677, 690 (2006); *see Franchise Tax Bd.*, 463 U.S. at 13.

This latter set of circumstances exists only in a "'special and small category' of cases." *Gunn*, 568 U.S. at 258 (quoting *Empire Healthchoice*, 547 U.S. at 699). Specifically, jurisdiction exists under this category only when "a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Id.*; *see Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 313–14 (2005); *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 808–09 (1988); *Flying Pigs, LLC v. RRAJ Franchising, LLC*, 757 F.3d 177, 181–82 (4th Cir. 2014).

The "presence or absence of federal-question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987); *see Pressl v. Appalachian Power Co.*, 842 F.3d 299, 302 (4th Cir. 2016). This "makes the plaintiff the master of the claim," because in drafting the complaint, the plaintiff may "avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar Inc.*, 482 U.S. at 392; *see Pinney*, 402 F.3d at 442; *Custer v. Sweeney*, 89 F.3d 1156, 1165 (4th Cir. 1996).

Under the "venerable well-pleaded complaint rule, jurisdiction lies under Section 1331 only if a claim, when pleaded correctly, sets forth a federal question[.]" *King v. Marriott Internat'l, Inc.*, 337 F.3d 421, 424 (4th Cir. 2003). But, when "a claim in which the federal question arises only as a defense to an otherwise purely state law action does *not* 'arise under' federal law . . . jurisdiction would not lie under Section 1331." *Id.* (citation omitted; italics in *King*).

Notably, "Federal preemption is ordinarily a federal defense . . . ." *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987).  And, the defense of federal preemption is not a basis for removal.  *King*, 337 F.3d at 424.

However, even when a well-pleaded complaint sets forth a state law claim, there are instances when federal law "is a necessary element" of the claim.  *Christianson*, 486 U.S. at 808.  Under certain circumstances, such a case may be removed to federal court.  The *Pinney* Court explained, 402 F.3d at 442 (internal citation omitted):

> Under the substantial federal question doctrine, "a defendant seeking to remove a case in which state law creates the plaintiff's cause of action must establish two elements: (1) that the plaintiff's right to relief necessarily depends on a question of federal law, and (2) that the question of federal law is substantial." If the defendant fails to establish either of these elements, the claim does not arise under federal law pursuant to the substantial federal question doctrine, and removal cannot be justified under this doctrine.

### C.  Federal Preemption of State Law

Defendant contends that removal is proper because plaintiff's claims, styled as state law causes of action, concern ERISA.  Therefore, defendant asserts that the doctrine of complete preemption applies.

Plaintiff argues that complete preemption cannot exist because there is not a "substantial enough" connection between his reference to ERISA and his claims. ECF 13-1 at 7 (citing *Custer*, 89 F.3d at 1164).  He states, ECF 13-1 at 10: "The force of ERISA in this case is certainly too unsubstantial for ERISA to supplant either the wrongful termination or retaliation causes of action."

The issue necessarily implicates the doctrines of complete preemption and ordinary preemption, which are entirely distinct for the purpose of removal.  *See Meade v. Avant of Colo., LLC*, 307 F. Supp. 3d 1134, 1140 (D. Colo. 2018) ("[T]he doctrine of complete preemption should not be confused with ordinary preemption."); *see also Powell v. Huntington Nat'l Bank*, 226 F.

-12-

Supp. 3d 625, 630 (S.D.W. Va. 2016) ("The linguistic resemblance between complete preemption and ordinary or conflict preemption does not signify a similarly close jurisprudential relationship.").

### 1.   Ordinary Preemption

The doctrine of ordinary preemption, also known as  conflict preemption, is rooted in the Supremacy Clause of the Constitution.  The Supremacy Clause, U.S. Const. art. VI, cl. 2, provides that a federal enactment is superior to a state law, so a "state law is naturally preempted to the extent of any conflict with a federal statute." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).  As a result, "[w]here state and federal law 'directly conflict,' state law must give way." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011) (citation omitted).  "In such circumstances, the state law is preempted and without effect." *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 475 (4th Cir. 2014) (internal citation omitted).

Notably, "[f]ederal preemption of state law under the Supremacy Clause—including state causes of action—is 'fundamentally . . . a question of congressional intent.'" *Cox v. Duke Energy Inc.*, 876 F.3d 625, 635 (4th Cir. 2017) (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990)); *see Beneficial*, 539 U.S. at 9.  Congress may manifest its intent in three ways: (1) when it explicitly defines the extent to which its enactment preempts state law (express preemption); (2) when state law "regulates conduct in a field that Congress intended the Federal Government to occupy exclusively" (field preemption); and (3) when state law "actually conflicts with federal law" (conflict or ordinary preemption). *English*, 496 U.S. at 78–79.  In sum, the ordinary preemption doctrine "regulates the interplay between federal and state laws when they conflict or appear to conflict." *Decohen v. Capital One, N.A.*, 703 F.3d 216, 222 (4th Cir. 2012).

Ordinary preemption "occurs when there is the defense of 'express preemption,' 'conflict preemption,' or 'field preemption' to state law claims." *Meade*, 307 F. Supp. at 1140. Thus, ordinary preemption is best characterized as a federal defense. *See Darcangelo v. Verizon Commc'ns, Inc.*, 292 F.3d 181, 186–87 (4th Cir. 2002) (quoting *Taylor*, 481 U.S. at 63) ("Under ordinary conflict preemption, state laws that conflict with federal laws are preempted, and preemption is asserted as 'a federal defense to the plaintiff's suit.'"); *Powell*, 226 F. Supp. 3d at 630 (quoting *Caterpillar Inc.*, 482 U.S. at 392) ("Ordinary preemption is a 'defense to the allegations.'"); *Richards v. Appalachian Power Co.*, 836 F. Supp. 2d 436, 439 (S.D. W. Va. 2011) ("[C]onflict preemption is simply a defense to a state-law claim.").

Of relevance here, it is "settled law that a case may *not* be removed to federal court on the basis of a federal defense, *including the defense of pre-emption,* even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue." *Caterpillar Inc.*, 482 U.S. at 393 (emphasis added); *see Vaden v. Discover Bank*, 556 U.S. 49, 60 (2009). Therefore, when examining the well-pleaded allegations in a complaint for purposes of removal, a court must "ignore potential defenses." *Beneficial*, 539 U.S. at 6.

Put another way, the "existence of a federal defense normally does not create statutory 'arising under' jurisdiction, and 'a defendant [generally] may not remove a case to federal court unless the *plaintiff's* complaint establishes that the case "arises under" federal law.'" *Aetna Health Inc. v. Davila*, 542 U.S. 200, 207 (2004) (emphasis in original) (alteration in *Davila*) (internal citations omitted) (quoting *Franchise Tax Bd.*, 463 U.S. at 10). Thus, if the basis for preemption "does not appear on the face of a well-pleaded complaint," it is a defense, and "therefore, does not authorize removal to federal court." *Taylor*, 481 U.S. at 63; *see Pinney*, 402 F.3d at 449.

-14-

### 2. Complete Preemption

In contrast to ordinary preemption, a case *is* removable from state court to federal court based on the doctrine of complete preemption.

The complete preemption doctrine is a "corollary of the well-pleaded complaint rule." *Taylor*, 481 U.S. at 63; *see In re Blackwater Sec. Consulting, LLC*, 460 F.3d 576, 584 (4th Cir. 2006). Complete preemption exists where Congress "so completely pre-empt[s] a particular area that any civil complaint raising this select group of claims is necessarily federal in character." *Taylor*, 481 U.S. at 63–64; *see King*, 337 F.3d at 425 (stating that "in some cases, federal law so completely sweeps away State law that any action purportedly brought under State law is transformed into a federal action that can be brought originally in, or removed to, federal court").

The Supreme Court has explained: "When [a] federal statute *completely* pre-empts [a] state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law." *Beneficial*, 539 U.S. at 8 (emphasis added). So, "the doctrine of complete preemption 'converts an ordinary state common law complaint into one stating a federal claim.'" *Darcangelo*, 292 F.3d at 187 (quoting *Taylor*, 481 U.S. at 65); *accord Pinney*, 402 F.3d at 449. This, in turn, endows a federal court with subject matter jurisdiction over claims lodged under state law. *See Darcangelo*, 292 F.3d at 187. Therefore, federal question jurisdiction is satisfied "when a federal statute wholly displaces the state-law cause of action through complete pre-emption." *Id.*; *see Vaden*, 556 U.S. at 61; *Davila*, 542 U.S. at 207–08.

The complete preemption doctrine "recognizes that some federal laws evince such a strong federal interest that, when they apply to the facts underpinning the plaintiff's state-law claim, they convert that claim into one arising under federal law." *In re Blackwater*, 460 F.3d at 584. Indeed,

complete preemption is a jurisdictional doctrine that "'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *Caterpillar Inc.*, 482 U.S. at 393 (quoting *Taylor*, 481 U.S. at 65); *see Pinney*, 402 F.3d at 449; *see also Lontz v. Tharp*, 413 F.3d 435, 439 (4th Cir. 2005) (noting that the complete preemption doctrine is an "exception" to the well-pleaded complaint rule); *Hannibal v. Fed. Express Corp.*, 266 F. Supp. 2d 466, 469 (E.D. Va. 2003) (observing that, where the defendant argued that removal was proper because the plaintiff's contract claim was governed exclusively by federal common law, the defendant attempted "to argue that federal common law completely preempts" the plaintiff's state breach of contract claim); *Goepel v. Nat'l Postal Mail Handlers Union, a Div. of LIUNA*, 36 F.3d 306, 311–12 (3d Cir. 1994) (internal citation omitted) ("[T]he only state claims that are 'really' federal claims and thus removable to federal court are those that are preempted completely by federal law.").

In sum, the doctrine dictates that "there is 'no such thing' as the state action, since the federal claim is treated as if it appears on the face of the complaint because it effectively displaces the state cause of action." *Lontz*, 413 F.3d at 441 (quoting *Beneficial*, 539 U.S. at 11). But, in order for a court to find that a state law claim is completely preempted, "exacting standards" must be satisfied. *Lontz*, 413 F.3d at 441. To remove an action on the basis of complete preemption, a defendant must show that Congress intended for federal law to provide the "exclusive cause of action" for the claim asserted. *Beneficial*, 539 U.S. at 9; *see Barbour II*, 640 F.3d at 631 (Agee, J., concurring).

However, complete preemption is rare. Indeed, the Fourth Circuit recognizes a presumption against complete preemption, and it may only be rebutted when "federal law . . . 'displace[s] entirely any state cause of action.'" *Lontz*, 413 F.3d at 440 (alteration in

*Lontz*) (quoting *Franchise Tax Bd.*, 463 U.S. at 23).  "To rebut the presumption against complete preemption, a defendant must demonstrate that 'Congress'[s] intent in enacting the federal statute at issue' was to extinguish the state-law claim."  *Skidmore v. Norfolk S. Ry. Co.*, 1 F.4th 206, 212 (4th Cir. 2021) (alteration in *Skidmore*) (quoting *Metro. Life Ins. Co. v. Mass.*, 471 U.S. 724, 738 (1985)).  The defendant is required to show that: "(1) the preempting statute displays a clear congressional intent to 'entirely displace' state law; and (2) the preempting statute creates an exclusive federal cause of action in an area of 'overwhelming national interest.'"  *Id.* (quoting *Lontz*, 413 F.3d at 441).

To my knowledge, "the Supreme Court has, in fact, found complete preemption in regard to only three statutes."  *Mayor & City Council of Balt. v. BP P.L.C.*, 388 F. Supp. 3d 538, 561 (D. Md. 2019), *aff'd*, 952 F.3d 452 (4th Cir. 2020), *vacated and remanded*, ___ U.S. ___, 141 S. Ct. 1532 (2021), *aff'd*, 31 F.4th 178 (4th Cir. 2022); *see Beneficial*, 539 U.S. at 10–11 (National Bank Act); *Taylor*, 481 U.S. at 65–67 (ERISA § 502(a)(1)(B)); *Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists & Aerospace Workers*, 390 U.S. 557, 559–60 (1968) (Labor Management Relations Act § 301).  This is unsurprising because the doctrine represents a significant departure from the general rule that the plaintiff is "the master" of his claim, and "may avoid federal jurisdiction by exclusive reliance on state law."  *Caterpillar Inc.*, 482 U.S. at 392; *see also Lontz*, 413 F.3d at 441 (noting that complete preemption "undermines the plaintiff's traditional ability to plead under the law of his choosing").

Of relevance here, one of the statutes is ERISA.  In *King*, 337 F.3d at 425, the Court observed that "ERISA does completely preempt many state law claims."  Specifically, "when a complaint contains state law claims that fit within the scope of ERISA's § 502 civil enforcement provision,

those claims are converted into federal claims, and the action can be removed to federal court." *Darcangelo*, 292 F.3 at 187.

### 3. ERISA Preemption Generally

As mentioned, a court must "construe removal strictly," such that "reasonable doubts must be resolved against the complete preemption basis for it." *Lontz*, 413 F.3d at 441. Again, "removal jurisdiction raises significant federalism concerns." *Mulcahey*, 29 F.3d at 151. "If federal jurisdiction is doubtful, a remand is necessary." *Id.*

ERISA was "enacted to protect the interests of participants in employee benefit plans and their beneficiaries. . . ." *Marks v. Watters*, 322 F.3d 316, 322 (4th Cir. 2003); *see* 29 U.S.C. § 1001(b). It does so, *inter alia*, by "setting 'various uniform standards [for employee benefit plans], including rules concerning reporting, disclosure, and fiduciary responsibility.'" *Retail Industry Leaders Assoc. v. Fielder*, 475 F.3d 180, 190 (4th Cir. 2007) (quoting *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 91 (1983)).

In *Davila*, 542 U.S. at 200, the Supreme Court said: "The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans. To this end, ERISA includes expansive pre-emption provisions, which are intended to ensure that employee plan benefit regulation would be 'exclusively a federal concern.'" (Citations omitted); *see New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 646 (1995) (explaining that "[t]he basic thrust of the pre-emption clause was to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans"); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 46 (1987) (recognizing "the reservation to Federal authority [of] the sole power to regulate the field of employee benefit plans as ERISA's crowning achievement," and noting that the legislation's sponsors "emphasized both the breadth and importance of the preemption

provision" to "establish pension plan regulation as exclusively a federal concern.") (internal quotation marks and citations omitted); *Singer v. Black & Decker Corp.*, 964 F.2d 1449, 1452–53 (4th Cir. 1992) ("The preemption of state laws relating to employee benefits guarantees that plans and plan sponsors are subject to only a single, federal set of requirements.").

The case of *Sonoco Prods. Co. v. Physicians Health Plan, Inc.*, 338 F.3d 366, 370 (4th Cir. 2004), provides guidance.   There, the Fourth Circuit observed: "In the ERISA context, the doctrines of conflict preemption and complete preemption are important, and they are often confused."  The doctrine of conflict or ordinary preemption, however, does not provide a basis for removal.  *Id.*  Rather, only claims that are "'completely preempted' by ERISA's civil enforcement provision, § 502(a), are properly removable to federal court.  *Id.* (citation omitted).  Under conflict or ordinary preemption, "'state laws that conflict with federal laws are preempted, and preemption is asserted as a federal defense to the plaintiff's suit.'"  *Id.* at 370-71 (cleaned up) (quoting *Darcangelo,* 292 F.3d at 187, in turn quoting *Metro Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987)).

In *Sonoco*, the Fourth Circuit outlined "three essential requirements for complete preemption," as follows, 338 F.3d at 372:

> (1) the plaintiff must have standing under § 502(a) to pursue its claim; (2) its claim must "fall[ ] within the scope of an ERISA provision that [it] can enforce via § 502(a)"; and (3) the claim must not be capable of resolution "without an interpretation of the contract governed by federal law," i.e., an ERISA-governed employee benefit plan.  [Citations omitted; alterations in original]

"For ERISA preemption purposes, 'State law' includes both statutory and common law." *Custer*, 89 F.3d at 1166 (citing 29 U.S.C. § 1144(c)(1)).  And, "it is entirely within the power of Congress to completely eliminate certain remedies by preempting state actions, while providing no substitute federal action." *King*, 337 F.3d at 425.

In the ERISA context, conflict preemption is rooted in § 514(a), codified at 29 U.S.C § 1144(a). It states that ERISA "shall supersede any and all State laws insofar as they may now or

hereafter relate to any employee benefit plan. . . . ." In construing § 514(a), the phrase "relate to" is "'given its broad common-sense meaning, such that a state law 'relate[s] to' a benefit plan 'in the normal sense of the phrase, if it has a connection with or reference to such a plan.'" *Phoenix Mutual Life Ins. Co. v. Adams*, 30 F.3d 554, 560 (4th Cir. 1994) (*quoting Pilot Life Ins. Co.*, 481 U.S. at 47); *see District of Columbia v. Greater Washington Bd. of Trade*, 506 U.S. 125, 129–30 (1992). Stated another way, "ERISA pre-empts any state law that refers to or has a connection with covered benefit plans . . . 'even if the law is not specifically designed to affect such plans, or the effect is only indirect.'" *Greater Washington*, 506 U.S. at 129–30 (quoting *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 139 (1990)). Put simply, "preemption under § 514 precludes prosecution of the preempted state-law claim." *Marks*, 322 F.3d at 323.

To determine whether a state law claim is completely preempted under ERISA, courts look to its "civil enforcement provision," ERISA § 502(a), codified at 29 U.S.C. § 1332(a), which "completely preempts state law claims that come within its scope and converts these state claims into federal claims under § 502." *Darcangelo*, 292 F.3d at 187; *see Taylor*, 481 U.S. at 65–66. Section 502(a), titled "Persons empowered to bring a civil action," provides, in relevant part, that "a participant or beneficiary" may sue "to recover benefits under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan . . . ." 29 U.S.C. § 1132(a)(1).

Notably, complete preemption does not provide for dismissal of a claim. In *Darcangelo*, 292 F.3d at 187, the Fourth Circuit explained: "[W]hen a claim under state law is completely preempted and is removed to federal court because it falls within the scope of § 502, the federal court should not dismiss the claim as preempted, but should treat it as a federal claim under § 502." In other words, a state law claim that is completely preempted should be evaluated as a claim under

§ 502 for purposes of a motion to dismiss. *See Darcangelo*, 292 F.3d at 195–96 (evaluating preempted breach of contract claim as a claim for breach of fiduciary duties under § 502).

In *Marks*, 322 F.3d at 322–23, the Fourth Circuit said, *id*:

. . . ERISA precludes the prosecution of preempted state-law claims that are not otherwise saved from preemption under § 514(b) (2)(A) unless they fall within the scope of the exclusive civil enforcement mechanism provided by § 502(a) of ERISA, 29 U.S.C. § 1132(a), in which case they must be treated as federal causes of action under § 502(a) . . . . Thus, if a state-law claim preempted by § 514 is not included within the scope of § 502(a), the claim is susceptible to a § 514 defense, whether it is brought in State or federal court. But if a state-law claim falls within the scope of § 502(a), it is "completely preempted" and therefore treated as a federal cause of action.

Importantly, "the absence of a particular remedy under ERISA[] has no bearing on whether a state law falls within the scope of § 514 [ERISA's preemption provision]." *Custer*, 89 F.3d at 1166. And, "in such cases, preemption serves only as a federal defense, the barred claims are not completely preempted, and thus not removable to federal court." *King*, 337 F.3d at 425.

### III.    Discussion

### A.

Plaintiff maintains that his retaliation claim in Count I is his "primary" claim, whereas his unlawful discharge claim in Count II is "secondary." ECF 13-1 at 13.  Count II of the suit is at issue with regard to the question of removal and remand.

As to Count I, the retaliation claim, plaintiff asserts retaliation in connection with his disclosure to Ascentage "that Ascentage's hiring practices discriminated based on national origin and race." ECF 5, ¶ 43.  The claim is founded on S.G. § 20-1202 and the MCHRO.

S.G. § 20-1202 applies only to three Maryland counties:  Howard, Montgomery, and Prince George's.  S.G. § 20-1202(b) provides that a person "subjected to a discriminatory act prohibited by the county code may bring and maintain a civil action against the person that committed the alleged discriminatory act for damages, injunctive relief, or other civil relief."  In § 27-19(a)(1) of

the MCHRO, an employer is prohibited from engaging in discriminatory employment practices based on an "individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, genetic information, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment." And, an employer is prohibited from retaliating against an individual who opposes a discriminatory employment practice. MCHRO, § 27-19(4)(c)(1)(A).

Plaintiff maintains that in Count II he has pleaded a common law claim under Maryland law for wrongful discharge, pursuant to *Adler v. American Standard Corp.*, 291 Md. 31, 432 A.2d 464 (1981). ECF 13-1 at 1. According to Risdorfer, this count does not implicate ERISA with respect to removal. *Id.* at 8. Rather, the Complaint merely references ERISA as one of several public policies violated by defendant that led to plaintiff's termination. ECF 13-1 at 7.

Plaintiff posits that Count II "identifies ERISA as a public policy, which, if violated, can be used [to] support an *Adler* claim of wrongful termination." *Id.* But, he argues that neither § 502 nor § 510 of ERISA operates to create federal question subject matter jurisdiction in this case. *Id.* at 2. Further, plaintiff maintains that his "verbal reminder" to his employer of the duty to comply with ERISA does not qualify as an ERISA claim. *Id.* at 1. He states: "[T]he mention of a potential ERISA violation is too ancillary to support a primary cause of action." *Id.* at 8.

As to Count II, plaintiff contends that a so called *Adler* claim may be predicated on federal law as the public policy basis for a state law claim of wrongful discharge. *Id.* at 10 (citing *Burrell v. Bayer Corp.*, 918 F.3d 372, 378-79 (4th Cir. 2019)). He asserts: "If even one theory for each of the plaintiff's claims does not require interpretation of federal law, resolution of the federal-law question is not necessary to the disposition of the case." ECF 13-1 at 8 (citing *Mayor and City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 211 (4th Cir. 2022)).

In the Notice of Removal, defendant stated that this Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, because the Complaint alleges violations of ERISA, ECF 1, ¶ 5, and "various other federal laws." *Id.* ¶ 6.  Defendant maintains that removal was proper because Count II is "completely preempted by ERISA's anti-retaliation provision, Section 510.  *See* 29 U.S.C. § 1140."  ECF 15 at 1-2.  According to defendant, plaintiff has "artfully plead" a so-called *Adler* claim, a common law claim for wrongful discharge, but in actuality he asserts a retaliation claim that is preempted by ERISA.  *Id.* at 1.

In Maryland, an employment contract of indefinite duration, *i.e.*, at will, may be terminated by either party, at any time, for any reason, so long as it is not for an illegal reason.  *Adler*, 291 Md. at 35, 431 A.2d at 467; *see Molesworth v. Brandon*, 341 Md. 621, 628, 672 A.2d 608, 612 (1996).  But, under *Adler* and its progeny, Maryland recognizes an exception to the at will employment doctrine, by way of a common law claim for wrongful discharge when the motivation for the discharge of the at will employee violates a clear mandate of public policy.  *Adler*, 291 Md. at 47, 432 A.2d at 473; *see*, *e.g.*, *Yuan v. Johns Hopkins Univ.*, 452 Md. 436, 450, 157 A.3d 254, 262 (2017); *Molesworth*, 341 Md. at 629, 672 A.2d at 612; *Makovi v. Sherwin-Williams Co.*, 316 Md. 603, 626, 561 A.2d 179, 189 (1989). And, "federal law may serve as the basis for Maryland public policy." *Elliott v. Maryland Correctional Training Center*, CCB-20-2963, 2022 WL 814294, at *5 (D. Md. Mar. 17, 2022) (citing *Adler v. Am. Standard Corp.*, 538 F. Supp. 572, 578-79 (D. Md. 1982)).

The issue of what constitutes a clear mandate of public policy is one that requires "utmost circumspection." *Adler*, 291 Md. at 46, 432 A.2d at 472.  The "declaration of public policy is normally the function of the legislative branch." *Id.* at 45, 432 A.2d at 472.  And, the "chief sources of public policy" are found in "'prior judicial opinions, legislative enactments, or

administrative regulations' . . . ." *Yuan*, 452 Md. at 451, 157 A.3d at 263 (citation omitted).  But, it must "be reasonably discernible from prescribed constitutional or statutory mandates." *Wholey v. Sears Roebuck*, 370 Md. 38, 53, 803 A.2d 482, 491 (2002).

Notably, in Maryland, "[a]n employee fired for retaliation for reporting a violation of a state or federal law is alone insufficient to establish a valid wrongful discharge claim based on public policy." *Yuan*, 452 Md. at 451-52, 157 A.3d at 263. Furthermore, the Maryland Court of Appeals[6] has said that because the "generally accepted reason for recognizing the tort" is "that of vindicating an otherwise civilly unremedied public policy violation," the tort does not apply in cases alleging employment discrimination prohibited by Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*., or the Maryland Fair Employment Practices Act, because those laws already provide a civil remedy. *Makovi*, 316 Md. at 626, 561 A.2d at 190. But, at this juncture, the question of whether the claim actually implicates a clear mandate of public policy is not at issue.

## B.

In its opposition to the Motion to Remand, defendant does not provide a single reason for this Court to retain jurisdiction pursuant to a federal law, other than ERISA. *See* ECF 15. According to defendant, complete preemption applies here because of plaintiff's reference to ERISA. *Id.*

---

[6] In the general election held in November 2022, the voters of Maryland approved a constitutional amendment to change the name of the Maryland Court of Appeals to the Supreme Court of Maryland. And, the voters also approved changing the name of the State's intermediate appellate court, the Maryland Court of Special Appeals, to the Appellate Court of Maryland. These changes went into effect on December 14, 2022. *See* Press Release, Maryland Courts, Voter-approved constitutional change renames high courts to Supreme and Appellate Court of Maryland (Dec. 14, 2022), https://www.courts.state.md.us/media/news/2022/pr20221214#:~:text=Effective%20immediately %2C%20the% 20Court% 20of,the%20Appellate% 20Court% 20of% 20Maryland.  However, I shall refer to the courts by the names in use when the particular opinions were issued.

Section 502(a)(3) of ERISA permits a plan participant, beneficiary, or fiduciary to bring a civil action, *inter alia*, to enjoin any act that violates any provision of ERISA or the terms of the employee benefit plan. *See* 29 U.S.C. § 1132(a)(3). Plaintiff did not file such an action in this case.

Section 510 of ERISA, 29 U.S.C. § 1140, is titled "Interference with Protected Rights." It makes it unlawful, *inter alia*, "for any person to discharge, fine, suspend, expel, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the [plan or ERISA] . . . . It shall be unlawful for any person to discharge, fine, suspend, expel, or discriminate against any person because he has given information or has testified or is about to testify in any inquiry or proceeding relating to this chapter or the Welfare and Pension Plans Disclosure Act." The applicability of this provision is discussed, *infra*.

Section 514 is also pertinent. It states that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ."

The Complaint states that plaintiff "observed and reported Ascentage's non-compliance with several tax and employment regulations," such as Ascentage "not depositing employee income deductions" into employee HSAs, FSAs, and 401(k) accounts. ECF 5, ¶ 33. Subsequently, "Risdorfer reported to Tripp that Ascentage had a fiduciary responsibility under the Employee Retirement Income Security Act to make sure that Ascentage properly deposited deductions into in [sic] employee accounts." *Id.* ¶ 34. Thereafter, "Tripp informed Risdorfer that, under Yang's direction, Ascentage was terminating his employment due to the fact that he 'was not a good fit.'" *Id.* ¶ 36.

The issue that plaintiff presented to his employer as to compliance with ERISA was one of multiple concerns that he raised. *See id.* ¶ 49. His other concerns included Ascentage's demand

for protected personal information of U.S. employees; Ascentage's handling of tax obligations; Ascentage's hiring practices; its immigration practices; Ascentage's lack of compliance with federal relegations for pharmaceutical companies; and plaintiff's refusal to terminate a "whistle blower."  ECF 5, ¶ 49.

In the Complaint, however, plaintiff makes no reference to an "employee benefit plan." Indeed, plaintiff has not stated that the FSA and HSA accounts, or the 401(k) plan, are in connection with an employee benefit plan. Nevertheless, I am satisfied that Risdorfer has alleged facts supporting a plausible inference that the FSA and HSA contributions and/or the 401(k) plan are regulated or governed by ERISA. *Holloway v. Maryland,* 32 F.4th 293, 300 (4th Cir. 2022); *see also McKelvey v. Canteen Corp.*, HAR 93–2474, 1994 WL 149606, at *5 n. 10 (D. Md. Feb. 16, 1994) (assuming, at the motion to dismiss stage, that the "employees' health insurance trust fund" was an "employee benefit plan" under ERISA, because defendant argued for ERISA preemption).

Even so, Risdorfer claims that he merely told Ascension of its "non-compliance" with "tax and employment regulations," ECF 5, ¶ 33, and he "reported to Tripp that Ascentage had a fiduciary responsibility" under ERISA with respect to the HSA, FSA, and 401(k) accounts.  *Id.* ¶ 34.  According to Risdorfer, defendant acted in a variety of unlawful ways, including as to its obligations under ERISA, and he was terminated when he raised the alleged various improprieties with his employer.  And, plaintiff asserts:  "Risdoerfer's termination violated a clear mandate of public policy because Risodrfer was terminated for reporting," *inter alia*, "his concerns regarding Ascentage's failure to comply with ERISA . . . ." *Id.* ¶ 49(v).

To be sure, "ERISA does not preempt only state laws specifically designed to affect employee benefit plans or only state laws dealing with the subject matters covered by ERISA.

Rather, the scope of ERISA's preemption is deliberately expansive and designed to make regulation of employee benefit plans exclusively a federal concern." *Brown v. Emmitsburg Glass Co.*, TJS-12-2911, 2013 WL 3336602, at *3 (D. Md. July 1, 2013) (internal citations and quotations omitted). Further, "ERISA preempts 'any and all State laws insofar as they may now or hereafter relate to any employee benefit plan' that is governed by ERISA." *Cunningham v. Space Telescope Science Institute*, WDQ-05-1084, 2006 WL 8456603, at *3 (D. Md. Oct. 26, 2006) (quoting ERISA § 514(a)); *see also Jassie v. Mariner,* DKC 15-1682, 2016 WL 67257, at *4 (D. Md. Jan. 6, 2016).

Nevertheless, the mere mention of the word "ERISA" is not enough to justify removal on the basis of complete preemption.  "ERISA's preemptive scope has limits. Some state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law relates to the plan." *O'Brien v. Verizon Communications*, DKC-2007-0501, 2008 WL 11509720, at *2 (D. Md. Feb. 21, 2008) (internal citation and quotation omitted).  And, "ERISA was not intended to preempt 'traditional state-based laws of general applicability [that do not] implicate the relations among the traditional ERISA plan entities'. . . ."  *International Union v. Mystic, LLC*, ICB-16-02030, 2016 WL 4596353, at *10 (S.D.W.V. Sep. 2, 2016) (quoting *Coyne & Delaney Co. v. Selman*, 98 F.3d 1457, 1459 (4th Cir. 1996*.*

Of relevance, "a state law that is preempted under § 514 (conflict preemption) will not always be preempted under § 502 (complete preemption)." *Darcangelo*, 292 F.3d at 191 n. 3. And, as discussed, conflict preemption is not sufficient to justify removal to federal court. *See Chesters v. Welles-Snowden,* 444 F. Supp. 2d 342, 345 (D. Md. 2006).  In contrast, "when complete preemption exists, 'the plaintiff simply has brought a mislabeled federal claim, which may be

asserted under some federal statute.'" *Prince v. Sears Holdings Corporation*, 848 F.3d 173, 177 (4th Cir. 2017) (internal citations and quotations omitted).

As indicated, the "three essential requirements for complete preemption" are that "(1) the plaintiff must have standing under § 502(a) to pursue [his] claim; (2) [his] claim must "fall[ ] within the scope of an ERISA provision that [he] can enforce via § 502(a)"; and (3) the claim must not be capable of resolution "without an interpretation of the contract governed by federal law," i.e., an ERISA-governed employee benefit plan." *Sonoco Products*, 338 F.3d at 372 (citations omitted; alterations in original).

Based on the allegations, plaintiff argues that the second prong of complete preemption cannot be satisfied, as "the protected activity to support an ERISA retaliation claim must consist of more than a simple verbal complaints [sic] to a supervisor." ECF 13-1 at 12 (citing *King*, 337 F.3d at 427). I agree.

In *King*, 337 F.3d at 427, the plaintiff alleged that she was terminated for complaining to her supervisor and other Marriott officers and attorneys "about anticipated transfers of assets from Marriott's medical plan." She brought suit against the defendants in a Maryland state court, alleging that her termination was wrongful and in violation of public policy under Maryland law. *Id.* at 423. The complaint did not allege that King had testified in any legal or administrative proceeding, or that she was about to testify.  Nor did she allege that she had given information in such a proceeding. "At best, King's complaint, and the evidence in the record, show only that King filed internal complaints with some of her co-workers, her supervisor, and some of Marriott's attorneys . . . ." *King*, 337 F.3d at 423.

In the Court's view, these filings did not bring the plaintiff "within the ambit of section 510."  *Id.* The Court reasoned that the phrase "inquiry or proceeding" in § 510 "is limited to the

legal or administrative, or at least to something more formal than written or oral complaints made to a supervisor." *King*, 337 F.3d at 427. It said, *id.* at 428: "Because none of King's actions are protected under section 510, the only potentially relevant provision, ERISA does not provide a federal cause of action for King's allegations. Consequently, her state wrongful discharge claim is not completely preempted, and removal of her claim was inappropriate[]."

Defendant maintains that plaintiff's reliance on *King* is misplaced. ECF 15 at 6-9. Ascentage notes that *King* relied on a prior Fourth Circuit case that held that "'proceedings' under the [Fair Labor Standards Act ("FLSA")] are 'procedures conducted in judicial or administrative tribunals," and that "the provision connoted a level of formality not met by making an 'oral complaint to [a] supervisor.'" ECF 15 at 7 (citing *Ball v. Memphis Bar–B–Q Co.*, 228 F.3d 360 (4th Cir. 2000)). And, defendant urges the Court to consider that in *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1 (2011), the Supreme Court overruled *Ball* on this point. ECF 15 at 7-8.

In *Kasten*, 563 U.S. at 17, the Court ruled that the appellate court "erred in determining that oral complaints cannot fall within the scope of the phrase 'filed any complaint' in the [FLSA's] antiretaliation provision." Defendant argues: "In light of *Kasten*, Plaintiff's internal complaints to Tripp therefore qualify as protected activity under Section 510." ECF 15 at 8.

The question of whether *Kasten* undercuts *King* was considered in *Paasch v. National Rural Electric Cooperative Association*, 177 F. Supp. 3d 930 (E.D. Va. 2016). The plaintiff in *Paasch* argued that *Kasten* overruled *King,* and that her internal reporting of an ERISA violation was within the context of an inquiry or proceeding, as required by the Fourth Circuit.

In addressing the alleged tension between *King* and *Kasten,* the district court stated, 177 F. Supp. 3d at 941 (emphasis in original):

In *Kasten*, the Supreme Court focused on the phrase "filed any complaint" and concluded that FLSA protection could encompass oral as well as written complaints. 563 U.S. 1, 12, 131 S.Ct. 1325 (2011). Paasch argues that *Kasten* effectively overruled *King* because the court in King referenced its reasoning in *Ball*, which interpreted the term "proceeding" in FLSA's anti-retaliation provision. She argues that *Kasten* overrules *Ball* ; therefore, King is "effectively overriden." (Doc. 11, at 11). ERISA's retaliation provision, however, is starkly different from the FLSA's retaliation provision because ERISA does not include the language "filed any complaint." *See* 29 U.S.C. § 1140. Instead, § 1140 makes it unlawful for any person to discriminate against another because she has "given information" in an "inquiry or proceeding" related to an ERISA violation. *Id*. Thus, Paasch's reliance on *Kasten* is misguided because *Kasten's* holding turned on the Supreme Court's interpretation of the FLSA's broad and inclusive "filed any complaint" language, and here, ERISA's "inquiry or proceeding" language is much more narrow and specific. In addition, the Fourth Circuit in *Ball* analyzed the meaning of "proceeding" in the FLSA while *Kasten* analyzed whether an oral complaint could satisfy the language "filed any complaint." *Compare Ball*, 228 F.3d at 364, *with Kasten*, 563 U.S. at 7, 131 S.Ct. 1325. Therefore, *Kasten's* holding that an oral complaint may satisfy the FLSA retaliation provision does not undercut *King's* holding that information must be given in a legal or administrative inquiry or proceeding under ERISA's retaliation provision.

Risdorfer appears to allege that he made oral complaints. *See* ECF 5. But, regardless of whether he made oral or written complaints, he never alleges that he provided the complaints in connection with a legal or administrative inquiry.

The case of *Trujillo v. Landmark Media Enterprises, LLC*, 689 F. App'x. 176 (4th Cir. 2017) (per curiam), is also instructive. There, an employee who was terminated brought suit against the employer, alleging retaliation in violation of ERISA and defamation under State law. The plaintiff was the corporate Director of Benefits and Safety. He discovered that the parent company had not been properly vesting employers in the company's retirement plan. *Id.* at 177. And, he discovered misconduct as to the company's § 401(k) plan. *Id.* The plaintiff, who was responsible for filing IRS Form 5500, was fired after he attempted to detail the errors in the Form 5500. *Trujillo*, 689 F. App'x. at 178.

The Fourth Circuit concluded that the allegation that the employee was terminated for providing information in connection with legally required audits of a retirement plan was sufficient

to state a retaliation claim under ERISA. The Court referenced the holding in *King*, stating,

*Trujillo,* 689 F. App'x. at 178-79:

> ERISA's anti-retaliation statute reads, in pertinent part: "It shall be unlawful for any person to discharge, fine, suspend, expel, or discriminate against any person because he has given information or has testified or is about to testify in any inquiry or proceeding relating to [ERISA]." 29 U.S.C. § 1140. In *King*, we analyzed the proper scope of the phrase "inquiry or proceeding." Relying on a case interpreting "proceeding" in the Fair Labor Standards Act, and noting that "testified or is about to testify" precedes "inquiry or proceeding," we ruled that "inquiry or proceeding" in section 510 "is limited to the legal or administrative, or at least to something more formal than written or oral complaints made to a supervisor." *King*, 337 F.3d at 427. Thus, because the plaintiff in *King* had not testified in a proceeding or given information in such a proceeding, and instead had done nothing more than "file[ ] internal complaints with some of her co-workers, her supervisor, and some of Marriott's attorneys" regarding the transfer of certain funds, her actions were not protected under section 510. *Id.* at 428.

The Fourth Circuit noted the importance of analyzing the context of the particular report.

*Id.* at 179.  In doing so, it concluded that an individual who is  "fired for giving information in legally required audits and in the preparation of the [IRS] Form 5500" may in fact be reporting a violation in the context of an "inquiry or proceeding."

In light of the above, I am not persuaded that *Kasten* has upended the requirement for allegations in connection with an "inquiry or proceeding" in order to state a claim for retaliation under ERISA § 510. Risorfer's claims of retaliation and unlawful termination are not founded on the particulars of an employee benefit plan, nor were they made in the context of an inquiry or proceeding or a required report.  Rather, plaintiff merely referenced ERISA violations to his supervisor as one of multiple examples of his belief that defendant was engaged in wrongdoing.

Therefore, plaintiff's wrongful discharge claim is not completely preempted, as plaintiff has not pleaded that his internal complaints occurred in the context of an inquiry or proceeding. It follows that defendant had no basis on which to remove the case to federal court. *See Campbell v. Maryland General Hospital, Inc*., RDB 06-489, 2006 WL 8456716, at *2 (D. Md. May 9, 2006)

(remanding to State court when the complaint did not satisfy the *Sonoco Products* test).  A remand is appropriate.

### IV.    Conclusion

For the reasons stated above, I conclude that the case was not properly removed to federal court based on federal question jurisdiction.  Therefore, I shall remand the case to the Circuit Court for Montgomery County, pursuant to 28 U.S.C. § 1447(c).  And, in view of the foregoing, I decline to consider Ascentage's Motion to Dismiss (ECF 7).  Instead, I shall deny that motion, without prejudice to defendant's right to renew the motion in the appropriate forum.

An Order follows.


Date:   July 19, 2023                                            _____/s/_____
                                                                Ellen L. Hollander
                                                                United States District Judge